108 F.3d 1454
 44 ERC 1193, 323 U.S.App.D.C. 425, 65
USLW 2663,
27 Envtl. L. Rep. 20,729
 DAVIS COUNTY SOLID WASTE MANAGEMENT and Energy Recovery
Special Service District, a Utah political
subdivision, Petitioners,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent.
 Nos. 95-1611, 96-1015 and 96-1048.
 United States Court of Appeals,
District of Columbia Circuit.
 March 21, 1997.
 
 Before: WALD, GINSBURG and RANDOLPH, Circuit Judges.
 ORDER
 PER CURIAM.
 
 
 1
 Upon consideration of respondent's petition for rehearing on remedy, filed February 4, 1997, the responses thereto and of the reply, it is
 
 
 2
 ORDERED that the petition be granted for the reasons set forth in the attached opinion of the Court.
 
 
 3
 PER CURIAM.
 
 
 4
 Respondent, the Environmental Protection Agency ("EPA"), requests rehearing on the remedy portion of the opinion entered in Davis County Solid Waste Management v. EPA, 101 F.3d 1395 (D.C.Cir.1996) ("Davis"). In Davis we held that the EPA violated the plain meaning of section 129 of the Clean Air Act, 42 U.S.C. § 7429 (1994), in 1995 when it promulgated emission standards for municipal waste combustor ("MWC") units because the EPA created categories of MWC units based on the aggregate municipal solid waste ("MSW") capacity of the plant at which a MWC unit was located instead of the MSW capacity of the unit itself. At oral argument counsel for the EPA had stated that all of the 1995 standards would need to be vacated were we to hold that section 129 required categorization of MWC units based on unit capacity. We therefore vacated the standards in their entirety. The EPA now asks us to reconsider our decision to vacate the standards in their entirety and instead to vacate the 1995 municipal waste combustor emissions limits only as they apply to MWC units with unit capacities below 250 tons/day ("small MWC units") and cement kilns, thereby retaining the new source performance standards ("NSPS") for new units with unit capacities of 250 tons/day or more ("large MWC units") and the emission guidelines for existing large MWC units pending the EPA's amendment of these standards on remand. According to the EPA, the recategorization of MWC units required by our Davis opinion will not alter the NSPS applicable to new large MWC units and will have only a nominal effect on the emission guidelines applicable to existing large MWC units, whereas vacating these standards will have a serious adverse environmental impact even if the EPA quickly repromulgates the standards. Petitioner Waste Energy Partners Limited Partnership supports the EPA's rehearing petition in full, while petitioner Davis County Solid Waste Management District supports only the EPA's request that we retain the 1995 NSPS for new units. Petitioner Cement Kiln Recycling Coalition takes no position on the EPA's rehearing request.
 
 
 5
 We agree with the EPA's claim that the recategorization of MWC units in light of our Davis opinion will not meaningfully affect either the NSPS or the emission guidelines for large units. As described in our initial opinion, see id. at 1398-99, section 129 requires that the EPA set emission standards for different categories of MWC units on a pollutant-by-pollutant basis using the maximum achievable control technology ("MACT") methodology. Under the MACT methodology, the emissions standards for new units in a category must be at least as stringent as "the emission control ... achieved in practice by the best controlled similar unit," while the standards for existing units must be at least as stringent as "the average emissions limitation achieved by the best performing 12 percent of units in the category." 42 U.S.C. § 7429(a)(2). The 1995 standards included, in essence, four separate sets of emissions limits: NSPS for new units with aggregate plant MSW capacities above 250 tons/day, NSPS for new units with aggregate plant capacities of 250 tons/day or less, emission guidelines for existing units with aggregate plant MSW capacities above 250 tons/day, and emission guidelines for existing units with aggregate plant capacities of 250 tons/day or less.[1] Our conclusion that section 129 required MWC units to be grouped by their unit MSW capacity rather than aggregate plant capacity meant that 45 existing MWC units--hereinafter referred to as the "Davis class" units--would have to be recategorized. The Davis class units have unit MSW capacities of 250 tons/day or less but are located at plants with aggregate MSW capacities above 250 tons/day. These units had been categorized with large MWC units because of their aggregate plant capacities, but after Davis would be grouped with small MWC units.
 
 
 6
 In our initial opinion, we noted that, given the MACT methodology, this recategorization of the 45 Davis class units would clearly affect the emissions guidelines applicable to existing small MWC units. The influx of Davis class units substantially increased the size of the small MWC unit category, thus at a minimum entailing that additional units would have to be considered in determining the best performing 12 percent of units; moreover, it appeared likely that many of the Davis class units had more advanced emission control systems than many other small MWC units, so that, unless the EPA subcategorized among small MWC units, the standards applicable to small MWC units would become significantly more stringent. See Davis, 101 F.3d at 1401, 1407-08, 1411. But we also acknowledged that the impact of the Davis decision on the other MWC emission standards was not clear, commenting that "it [was] not immediately apparent to us ... that all of the 1995 standards must be vacated," id. at 1411, because, given the MACT methodology, it seemed unlikely that the practical effect of the other standards would change. Although the 1995 standards did not mandate implementation of any specific air pollution control technology, in practice MWC operators would have to install specific pollution control systems to meet the emission limits contained in the standards, with the type of system being required varying with the type of MWC unit. Davis, 101 F.3d at 1397-1400. For example, the standards for new large units could only be met through use of, at a minimum, a spray dryer ("SD")/fabric filter ("FF")/carbon injection ("CI")/selective noncatalytic reduction ("SNCR") system.[2] We noted that the standards for new large units would change only if the shift of the Davis class units meant that there were no longer any large units employing the SD/FF/CI/SNCR technology, since the MACT methodology required that emission standards for new units be at least as stringent as the level of control achieved by the best controlled similar unit. Similarly, the 1995 emission guidelines for existing large units in practice required the use of a SD/FF or electrostatic precipitator ("ESP")/CI/SNCR system and would only be affected if the shift of the Davis units meant that the emission control achieved by 12 percent of the MWC units remaining in the large unit category required use of a different pollution control technology.[3]
 
 
 7
 We nonetheless decided to vacate the 1995 standards in their entirety, despite our doubts about the need to do so, because of the difficulty in determining what effect the shift of the Davis class units would have on these standards for large units based on the record then before us and because at oral argument "counsel for the EPA stated that he believed the 1995 standards would need to be vacated in their entirety if we were to decide that MWC units had to be recategorized by unit capacity." Id. In its rehearing petition, the EPA now indicates that in fact recategorizing by unit capacity and the resultant shift of the Davis class units will not have any meaningful effect on the emission standards for new and existing large units and has supplied us with a detailed declaration by Walter H. Stevenson, senior EPA engineer and team leader on the MWC Project for the development of the 1995 standards, to explain why this is the case. According to the Stevenson Declaration, none of the Davis class units were used in determining the NSPS for new large units, and therefore none of the NSPS emission limits and other requirements will be affected by the shift of the Davis units. In particular, new units will still have to install SD/FF/CI/SNCR air pollution control technology. Stevenson Decl. p 4. Meanwhile, the shift of the 45 Davis units has reduced the pool of existing large MWC units to 164 units from 209 units, so that 12 percent of the units in the category now equals 20 units instead of the 25 units, and some of the Davis units had been used to determine the emission limits for certain pollutants in the 1995 emission guidelines. Hence, the EPA must now recalculate the MACT floor for each pollutant--the minimum emission standard allowed under section 129's MACT methodology--based on the average emission limitation achieved by the best performing 20 units of the units that remain in the large MWC unit category. Id. pp 7-8. But the Stevenson Declaration states that the recalculation will have only a nominal effect on the emission guidelines for existing large units. Since the EPA set the 1995 emission guidelines for several pollutants at levels that were more stringent than the MACT floors, the emission limits for all but four pollutants will remain the same and the changes in the limits for these four pollutants are slight. In only one instance will the recalculation result in an emission limit less stringent than that included in the 1995 emission guidelines.[4] Id. p 8. Moreover, large MWC units will need to employ the same emissions control technology, SD/FF or ESP/CI/SNCR, to comply with the limits in the revised guidelines as they would to comply with the limits in the 1995 emissions guidelines. Id. p 9.[5]
 
 
 8
 On the other hand, the Stevenson Declaration makes clear that vacating the standards for large units could have significant deleterious effects on MWC emissions control. The NSPS applies to new and modified MWC units, with new units defined as MWC units the construction of which begins after the EPA has proposed emission standards and modified units as units at which certain modifications, namely modifications above a certain cost or representing changes that effect emissions of regulated pollutants, have occurred after the effective date of the NSPS.[6] 42 U.S.C. §§ 7429(g)(2) to (g)(3); see also id. § 7429(f)(1) (NSPS becomes effective six months after promulgation). The 1995 standards therefore specified that the NSPS would apply to all units the construction of which commenced after September 20, 1994 (the date that the new standards were first proposed) or any units the modification of which commenced after June 19, 1996 (the date that the NSPS will become effective). Final Rule, 60 Fed.Reg. at 65,391, 65,419. If the NSPS are vacated, these units will instead be considered existing units and thus subject to the less strict emission guidelines, as would any units constructed up until the time that the EPA promulgates the revised NSPS (which the EPA expects to do in mid-1997) and units that are modified up to six months after the promulgation date. In other words, the effect of vacating the NSPS for large MWC units is to permanently lower the emissions limits applicable to some of these units.
 
 
 9
 Vacating the emission guidelines for existing large units would not permanently alter the limits applicable to existing large units, but would significantly delay the date at which compliance with the limits is required. Under section 129, states have up to a year to submit a plan that implements and enforces the guidelines within one year of the guidelines' promulgation, the EPA must approve or disapprove the plan within six months, and MWC units must demonstrate compliance with their state's plan within three years of the plan's approval. Section 129 also imposes an ultimate compliance date of five years after promulgation, by which point all units must be in compliance with the guidelines regardless of the status of their state's plan. The ultimate compliance deadline for the emission guidelines applicable to existing large units, if the guidelines are retained, will be December 19, 2000. The deadline will be much later if the guidelines are vacated; even if the EPA issued revised guidelines tomorrow, the compliance deadline would not occur before March 2002, fifteen months later. Since the EPA does not expect to reissue the emission guidelines for large units before mid-1997, the compliance delay is more likely to be eighteen months. During this interim period existing large units will be subject to the emissions limits currently in force, which do not cover certain pollutants and impose a lower level of emissions control. See Davis, 101 F.3d at 1399-1400. Thus, vacating the guidelines will result in an eighteen month period in which greater MWC emissions will occur than would occur were we to remand for further rulemaking without vacating. According to the EPA, the amount of excess emissions will be substantial, particularly for pollutants such as dioxins, mercury, acid gases and particulate matter. Stevenson Decl. p 15.
 
 
 10
 The practical effect of vacating the 1995 standards for large units may not be as great as EPA predicts; some operators of large units may still go ahead with their plans to install more effective emission control systems since they know that such systems eventually will be required. But nonetheless, it seems likely that vacating the 1995 NSPS and emission guidelines for large units will result in significantly greater pollution emissions than would occur if these emission standards were not vacated. More importantly, leaving the NSPS and emission guidelines for large units other than cement kilns in place will have no prejudicial effect on MWC operators since these standards will change at most minimally as a result of our Davis opinion. It is therefore apparent that the more equitable and appropriate course for this court to take is to retain the 1995 NSPS and emission guidelines for large units other than cement kilns pending action by the EPA on remand. See, e.g., Allied-Signal, Inc. v. Nuclear Regulatory Comm'n, 988 F.2d 146, 150-51 (D.C.Cir.1993) ("whether to vacate [an inadequately supported rule] depends on 'the seriousness of the order's deficiencies ... and the disruptive consequences of an interim change that may itself be changed") (quoting International Union, UMW v. FMSHA, 920 F.2d 960, 967 (D.C.Cir.1990)); Fertilizer Inst. v. EPA, 935 F.2d 1303, 1312 (D.C.Cir.1991) ("when equity demands, an unlawfully promulgated regulation can be left in place while the agency provides the proper procedural remedy").
 
 
 11
 Davis argues that we should retain the NSPS but not the emission guidelines for large MWC units because "[g]uidelines for existing large MWC units have never been promulgated as such and, therefore, are not severable from the other guidelines as the EPA suggests." Davis Response at 4. While Davis is correct that the EPA did not promulgate standards for existing large units per se, as opposed to existing units at large plants, its emphasis on this point exalts form over substance. The group of MWC units now referred to as existing large units represents a subset of the old existing large plant category, with the only difference between the two being that the former excludes the Davis class units. Thus, in promulgating standards for existing large plants the EPA necessarily promulgated standards for all existing large units. Moreover, as the EPA notes, the standards always applied on a unit-by-unit basis, not a plant basis; aggregate plant capacity was used in the 1995 standards only to determine which emissions limits would apply to a given unit. Therefore, the emission guidelines for existing large units in place can be retained without changing the entity that is the subject of the regulations.
 
 
 12
 The real question for severability analysis is not whether the EPA separately issued standards for existing large units, but rather whether the EPA would have adopted the same standards for existing large units as it promulgated for existing large plants had the EPA not erroneously interpreted section 129 as allowing it to adopt an aggregate MSW capacity approach. "Whether an administrative agency's order or regulation is severable, permitting a court to affirm it in part and reverse it in part, depends on the issuing agency's intent." North Carolina v. FERC, 730 F.2d 790, 795-96 (D.C.Cir.1984). Severance and affirmance of a portion of an administrative regulation is improper if there is "substantial doubt" that the agency would have adopted the severed portion on its own. Id.; Bell Atl. Tel. Cos. v. FCC, 24 F.3d 1441, 1447 (D.C.Cir.1994). It is clear that the EPA would have adopted the standards for large MWC units even without the standards for small MWC units and cement kilns. The 1995 standards for large and small MWC units are not in any way "intertwined," Telephone & Data Sys. v. FCC, 19 F.3d 42, 50 (D.C.Cir.1994); in fact, they operate entirely independently of one another. Our decision in Davis clarified that these standards must also be separately determined, and as discussed above, the shift of the Davis class units will have at most a nominal effect on the large MWC unit standards. Moreover, the EPA has consistently differentiated between MWC units based on size, even before enactment of section 129. Davis, 101 F.3d at 1397-1400. There is simply no basis for believing that the EPA would not have adopted the standards applicable to large MWC units without the standards for small MWC units. The EPA never studied cement kilns prior to issuance of the standards and the rulemaking record reveals that the EPA knew that, at the time of issuance, no cement kiln would come under the standards because none combusted more than 30 percent municipal solid waste. See Davis Joint Appendix at 166, 170-71, 231A-231B. Hence, the EPA simply was not concerned with cement kilns in issuing the 1995 standards and would have adopted the same standards even if cement kilns were exempted. Since severance of the standards for small units and cement kilns "will not impair the function of [the other standards] ... and there is no indication that the regulation would not have been passed but for [the] inclusion" of the standards for small units and cement kilns, these standards are severable. K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 294, 108 S.Ct. 1811, 1819, 100 L.Ed.2d 313 (1988).
 
 
 13
 * * *
 
 
 14
 We grant the EPA's motion in full and amend our initial opinion so that we vacate the 1995 standards only as they apply to small MWC units and cement kilns since we agree with the EPA that the Davis opinion will not meaningfully alter the NSPS or the emission guidelines applicable to large units and that vacating the large unit standards will have a significant deleterious effect. We therefore leave the NSPS and emission guidelines for large units other than cement kilns in place pending further action by the EPA in response to our Davis opinion on remand.
 
 
 15
 So ordered.
 
 
 
 [1]
 In addition, for certain pollutants emissions limits were set according to the type of combustor and air pollution control technology in use at a MWC unit. See Standards of Performance for Municipal Waste Combustors and Emission Guidelines: Final Rule, 60 Fed.Reg. 65,387, 65,396-97, 65,401-02 (1995) ("Final Rule")
 
 
 [2]
 The emissions controls were also based on implementation of good combustion practices ("GCP"), but GCP were required of all units, see Davis, 101 F.3d at 1400-01, and thus they are irrelevant to the discussion here of the effect that recategorizing the Davis class units would have on the emissions standards applicable to different groups of units
 
 
 [3]
 We also concluded that the standards for new small units, based on the SD/FF/CI technology, would only change if one of the Davis units shifted into the small unit category used SNCR and was not otherwise distinguishable, so that after the shift the "best performing similar unit" for a new small unit would be one using SNCR. Davis, 101 F.3d at 1411. The EPA has not sought to have the 1995 NSPS for new small units be retained, suggesting either that one of the Davis class units does use SNCR or that there is some other reason why the shift will alter the NSPS for new small units. At any rate, since the EPA has not requested retention of the NSPS for small units, we exclude them from our discussion here
 
 
 [4]
 The emission limit for nitrogen oxides for massburn waterwall units will increase by a minimal amount, going from 200 to 205 parts per million ("ppm"). Stevenson Decl. p 8. In its rehearing petition, the EPA states that it will not reject state plans that incorporate the 205 ppm standard that are submitted for EPA approval in the period following the Davis decision and before amendment of the emission guidelines for large units. Petition for Rehearing at 3 n.3
 
 
 [5]
 None of the parties to this litigation disagrees with the EPA's assessment of the effect of the Davis opinion on the emission guidelines for existing large MWC units. For example, in its response to the EPA's rehearing petition, Davis stated that it "accepts the EPA's argument that properly categorizing existing MWC units as the Court directed will not materially change the emissions guidelines for existing large units." Davis Response at 3 (emphasis omitted). In addition, the Integrated Waste Services Association, a trade association representing the majority of the MWC industry, submitted an affidavit stating that it concurs in the EPA's conclusions "regarding the control technology and performance levels required by the new guidelines." Affidavit of Maria Zannes p 4, Petition for Rehearing Attachment B
 
 
 [6]
 Although section 129 does not specifically state that the NSPS applies to modified units, it excludes modified units from the definition of existing units and provides that the NSPS shall be issued pursuant to 42 U.S.C. § 7411, which defines new sources as those sources modification or construction of which occurs after publication or proposal of regulations, whichever is earlier. 42 U.S.C. §§ 7429(a)(1), 7429(g)(3); see also 42 U.S.C. § 7411(a)(2)